# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DENNIS WHITE,**

        **Petitioner,**

        **v.**

**WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,**

        **Respondent.**

**CASE NO. 2:18-cv-193**
**Chief Judge Edmund A. Sargus, Jr.**
**Chief Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Facts and Procedural History**

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 2} On April 17, 2014, appellant was indicted on two counts of kidnapping, in violation of R.C. 2905.01, and four counts of rape, in violation of R.C. 2907.02. The complaint alleged acts arising on or about October 5 and November 13, 1995, involving two victims, V.G. and T.L.

> {¶ 3} The matter was tried to the bench beginning April 21, 2015. The first witness for the state was V.G. In 1995, V.G. worked in Columbus performing housekeeping services. V.G. and her three children resided with V.G.'s father at the time.

> {¶ 4} In October 1995, V.G. was walking in the area of "18th and Monroe off of Main Street," after taking a bus to that location to look for her teenage daughter. Unable to locate her daughter, V.G. decided to leave. As she was leaving the area, V.G. encountered a male who "asked where was I going. He offered me a ride home." (Tr. Vol. I at 31.) V.G. got into the vehicle, and the man inquired if she drank beer. V.G. responded that she did and the man drove to a store to purchase

beer. V.G. drinks "Old English" beer. (Tr. Vol. I at 35.) At trial, V.G. identified plaintiff-appellee, the State of Ohio's exhibit No. 28 as two 40 ounce cans of "Old English 800." (Tr. Vol. I at 37.)

{¶ 5} The man then drove to the residence of V.G.'s father. V.G. and the man drank beer on the porch; around midnight, V.G. and the man left her father's residence to get some money. The man drove to East Livingston Avenue. He then "got very violent" and said: "Bitch, quit playing games with me. You know what I want and all this type stuff like that." (Tr. Vol. I at 40.) V.G. spoke "smart back" at the man, and he reacted "[r]eal violent" by stopping the vehicle suddenly. V.G. "felt afraid because [she] didn't know where [she] was," and she "had nothing to protect [her]." (Tr. Vol. I at 41.)

{¶ 6} The man drove to the back of a school yard and stopped the vehicle, opening the passenger side door. V.G. testified that he "forced himself on me inside the car, pulling my clothes and my shorts off to the side." According to V.G., he was "sexually picking my clothes off and entering me, my leg off, you know, forcing yourself inside someone. You're laying there trying to look and think something to get away and you can't." (Tr. Vol. I at 53.)

{¶ 7} The man "went into the trunk of the car. He had a belt." He began pulling V.G. from the vehicle, "[t]rying to tear [her] clothes." He then dragged her toward a tree. V.G. testified that he "[p]ut a belt around my neck and just trying to make me suck his [penis]. And I remember biting it and taking off running and screaming. And I guess [I] must have * * * made him nervous * * * because I remember him running back, getting in the car." (Tr. Vol. I at 42.) V.G. wrote down the license plate number of the vehicle on her leg. (Tr. Vol. I at 49.) After the man left the area, V.G. called the police from a phone booth.

{¶ 8} At trial, V.G. identified photographs taken of her at a hospital following the incident; she stated that the pictures identified bruising to areas of her neck, arm, knees, and back. V.G. spoke with a police detective at the hospital, and the detective showed her a photographic array. V.G. permitted hospital personnel to conduct testing with a rape kit "[b]ecause I was raped and assaulted and I didn't want * * * diseases." (Tr. Vol. I at 56.) V.G. testified she did not have consensual sex with the man.

{¶ 9} Subsequent to the incident, V.G. thought she saw her assailant drive past her father's house and make a threatening gesture with his hand. V.G. informed detectives that she "didn't want to be involved any more" because she did not want anyone to "come back and harm my father." (Tr. Vol. I at 61.) V.G. also informed police that she did not want to testify in court. At trial, V.G. identified appellant as the individual who assaulted and raped her.

{¶ 10} On cross-examination, V.G. acknowledged she was using crack cocaine in 1995, and she recalled smoking crack cocaine with appellant on the evening at

issue. V.G. stated that around that time period she also worked at a "bootleg," an establishment where "they sell illegal drinks—beer, liquor." (Tr. Vol. I at 87.) V.G. became acquainted with prostitutes through her work at the "bootleg." V.G. denied that she had ever engaged in prostitute activity.

{¶ 11} In 1995, Columbus Police Officer Kevin Jackson was assigned to the third shift on the east side of Columbus. On November 14, 1995, Officer Jackson was dispatched to Brookway Road following a report of a rape assault. The officer met a female, later identified as T.L., who stated that the incident occurred at approximately 4:00 a.m. The alleged victim described her assailant as "a male black who had [a] dark complexion, a thin mustache, was balding to no hair, between the age of 22 to 23 years." T.L. provided a description of the man's vehicle as a "dark maroon or burgundy * * * newer model Chrysler New Yorker." (Tr. Vol. I at 112.) Officer Jackson forwarded that information to a detective.

{¶ 12} In 1995, T.L. resided on Brookway Road near Livingston Avenue. T.L. worked at United Dairy Farmers, located at the corner of Livingston Avenue and Barnett Road, within approximately a three-block radius of her residence. T.L. did not have a vehicle at the time, and she walked to work. On November 13, 1995, T.L. walked from her townhome on Brookway Road toward Livingston Avenue. As she approached a traffic light near Livingston Avenue and Barnett Road, a vehicle pulled up beside her and the driver asked if she needed a ride; the driver was a black male, with a dark complexion. The man "asked me how far was I headed. And I told him just going down the street to United Dairy Farmers. And he said, I'm going in that location also." T.L. testified: "I had been drinking that night and I did get into the car with him." (Tr. Vol. I at 126.)

{¶ 13} The driver "went past Livingston, turned up Barnett [and] went behind United Dairy Farmers." At that point, T.L. thought she "was in big trouble." (Tr. Vol. I at 127.) The man pulled a knife on T.L., pointing it toward her as he drove behind United Dairy Farmers. He stopped the vehicle, "stepped up over the seat over top of [her] and he told [her], bitch, gets your clothes off." (Tr. Vol. I at 128.) T.L. took her clothes off "[b]ecause he had a knife on me." (Tr. Vol. I at 129.) He first pushed T.L.'s head down between his legs, forcing his penis in her mouth. The man then got on top of her. He held the knife to her throat and penetrated her vagina "with his penis." T.L. testified that she "was crying and * * * begging him not to do it and he wouldn't stop. He wouldn't stop until he was finished." (Tr. Vol. I at 130.) The man then "got off of me, set back in the seat of the car, he proceeded to start the car up and tell me, bitch, that wasn't going to be all. The next time he was going to fuck me in my ass and then kill me." (Tr. Vol. I at 131.) The man "told me that * * * wasn't going to be the last time, bitch." (Tr. Vol. I at 118–19.)

{¶ 14} He started the vehicle and began to drive away. T.L. was in "fear of [her] life," and as the vehicle approached a stop sign she "jumped out of the car as it was moving. * * * He sped off." (Tr. Vol. I at 119.) T.L. contacted police, and told an

officer she was "assaulted" and that her "life was threatened." (Tr. Vol. I at 120.) T.L. was taken to a hospital for treatment, and a rape kit was administered.

{¶ 15} T.L. testified that none of the activity was consensual. At trial, she identified state's exhibit Nos. 17 and 18 as photographs depicting the location where the incident took place. T.L. stated that she fully cooperated with police during the investigation. On cross-examination, T.L. acknowledged she was intoxicated on the date of the incident, and that she was less than a block from United Dairy Farmers when appellant stopped his vehicle.

{¶ 16} On November 14, 1995, Columbus Police Detective Kenneth Lawson responded to a sexual assault dispatch in which the individual reporting the assault had been taken to a hospital for a forensic examination. Detective Lawson interviewed T.L. that evening at the hospital, and collected several items of clothing and a rape kit containing slides and a swab; the detective submitted those items to the police department's property room.

{¶ 17} A police investigator subsequently provided information to Detective Lawson, advising him to "look at Dennis White." The investigator informed Detective Lawson that the same parking lot "had been used in a prior sexual assault that he was investigating." The investigator showed Detective Lawson "a photo of a license plate that was written on that victim's thigh" in the prior case; the investigator "[s]aid that through his investigation he learned that Dennis [White] was the brother of the person who had that car." (Tr. Vol. I at 168.)

{¶ 18} Detective Lawson prepared a photographic array which included appellant's picture. He showed the array to T.L., who stated that the individual in position number five had a similar skin tone as her assailant, and that the individual in position number six had similar eyes. She did not unequivocally identify any of the individuals in the array as her assailant. Detective Lawson testified that the investigation ended at that point because T.L. "was not interested in pursuing the case and so we classified it as * * * exceptionally cleared." According to the detective, "[t]he lab results came back saying that there was evidence with which we could work, which is why I prepared a search warrant in anticipation of needing blood; but we deferred to [T.L.'s] interest at that time, and she did not want to pursue the case." (Tr. Vol. I at 183.) T.L. told the detective: "I'm not comfortable pursuing a case if I can't say positively who it was." (Tr. Vol. I at 202.)

{¶ 19} Columbus Police Detective Timothy Hedrick, a member of the department's sexual assault unit, testified that he had reviewed old case files pertaining to V.G. and T.L. At trial, Detective Hedrick identified a number of exhibits from those cases, including property submitted to the Ohio Bureau of Criminal Investigation ("BCI") lab for analysis. The department "had a CODIS [Combined DNA Index System] hit come back from the lab identifying the suspect." (Tr. Vol. II at 249.) Detective Hedrick subsequently contacted V.G. and T.L., and both individuals indicated they were willing to cooperate. After obtaining the "CODIS match * * *

from BCI," a warrant was issued and appellant was arrested. (Tr. Vol. II at 251.) Detective Hedrick obtained DNA swabs from appellant at that time and submitted those samples to the BCI lab. According to Detective Hedrick, "[t]he main reason for reopening a case is due to the advancement of the science [and] what the lab can do with the specific property items." (Tr. Vol. II at 246–47.) The detective testified that the basis for charging appellant "was basically the DNA results." (Tr. Vol. II at 275.)

{¶ 20} Police detectives, including Detective Hedrick, interviewed appellant, and the state played a recording of that interview at trial. During the interview, appellant told detectives he did not "even know those women." (Tr. Vol. II at 263.) He also denied giving rides to two women in 1995 in the geographical areas indicated by the alleged victims.

{¶ 21} Hallie Garofalo, a forensic scientist with the DNA unit of BCI, testified that she analyzed DNA collected from V.G. and appellant and prepared a DNA report, dated May 5, 2014, summarizing those test results. Based on the evidence collected, Garofalo opined that appellant "cannot be excluded as the source of the DNA in the sperm fraction of the vaginal slides." (Tr. Vol. I at 214.)

{¶ 22} Garofalo also analyzed DNA collected from T.L. and appellant. Garofalo testified that "[d]ifferential extraction of the vaginal slides * * * resulted in a mixture consistent with contributions from [T.L.] and Dennis White." Garofalo opined that appellant "cannot be excluded as a contributor to the DNA from the vaginal slide." (Tr. Vol. I at 219.)

{¶ 23} At trial, appellant testified on his own behalf, and he acknowledged a 1998 burglary conviction for which he received a seven-year sentence. Appellant stated he was addicted to crack in 1995, and that he engaged in sexual activities with prostitutes at that time.

{¶ 24} Appellant gave the following testimony with respect to his encounter with V.G. on October 5, 1995:

I met [V.G.] as I was driving down the street. It was kind of late at night and she was walking down the street and she flagged me over. I pulled over and we talked. And I asked her does she have a stem. A stem is a crack pipe. And she said yes. So I told her I had some crack, you know, you want to get high with me. So she said yes. She got in the car. And in the process of us talking we decided that if I smoke some crack with her she would perform oral sex on me and I will be able to have sex with her.
(Tr. Vol. II at 302.)

{¶ 25} Appellant, who was driving a 1990 Pontiac, stated that he stopped the vehicle because "she was a prostitute. I knew she was a prostitute and I knew she probably knew where I could go get some crack." Appellant believed the woman

was a prostitute by "the way she was acting." (Tr. Vol. II at 304.) According to appellant, after V.G. got inside the vehicle "we just like drive and pull over, smoke, drive, pull over, smoke, pull over, smoke * * * as I recall over towards Scottwood and Barnett." (Tr. Vol. II at 308–09.)

{¶ 26} Appellant stated he was "rubbing her leg. She's rubbing on my leg." Appellant told the woman: "You know, I want some head. Can you give me some head? Yeah, sure. How much are you going to smoke with me? We going to smoke all of this." (Tr. Vol. II at 309.) Appellant testified: "We just had sex and she gave me some head." Appellant stated they were together "about four hours." (Tr. Vol. II at 310.) He denied driving to the home of V.G.'s father; he also denied observing two bottles of Old English 800, or that he saw V.G. drinking beer.

{¶ 27} Appellant testified that "it got to the point where I got tired of driving and pulling over, hitting, driving, pulling over, hitting. I got tired so I knew a place we could go where it wouldn't be no problem, we just sit there." (Tr. Vol. II at 311–12.) He then drove to a location on Scottwood Road and turned off the engine. Appellant denied forcing V.G. to have sex, and stated she willingly engaged in oral sex. He also denied using his belt to choke her during the incident. According to appellant, the encounter ended when they had a disagreement over her taking the last "dope that was there that was mine." (Tr. Vol. II at 315.) Appellant told her to get out of the vehicle, and he drove away.

{¶ 28} During direct examination, defense counsel asked appellant why he told detectives he did not use drugs in 1995, and appellant responded: "At that time it was—actually talking about it, it's like a trigger to me. And I was so shocked for him to say that, I just says no." (Tr. Vol. II at 317.) When asked why he told detectives he was not with T.L. on November 13, 1995, appellant stated that he "couldn't remember who [he] was with." (Tr. Vol. II at 318.)

{¶ 29} Appellant testified that he first encountered T.L. at a crack house where he observed her go into a room with a man. Later, on November 13, 1995, appellant was driving down Livingston Avenue and "she flagged me down." (Tr. Vol. II at 319.) Appellant thought she was a prostitute. Appellant asked T.L. "did she know where I could get some dope." (Tr. Vol. II at 320.) Appellant testified that "[s]he got in the car and we drove over to * * * to get some dope." (Tr. Vol. II at 321.) Appellant gave her $65 and she went inside and returned with drugs.

{¶ 30} They drove away and were "[j]ust riding around pulling over to * * * [s]moke. Trick. She give me some head. I, you know, have sex with her and pull off in that spot and, you know, hit it again, pull over, find another spot." (Tr. Vol. II at 322–23.) They eventually stopped at the location depicted in state's exhibit No. 18. He denied carrying a knife that evening. Appellant testified they had consensual sex at the location.

{¶ 31} Appellant gave the following account as to how the encounter ended:

Well, after we got down to the last bit of the dope, she asked me did I have any more. I says, no, I don't, I don't have any more. She says, well, you told me that * * * I'm going to be able to take some back to my friend. I said you didn't mention anything to me about no guy, no friend or nothing. So she said yes, I did, yes, I did. I said, no, you didn't. She got to be belligerent with me, you know, argumentative, you know. She just like getting loud and acting, you know, un—just real unruly, you know, no. I says no, get out. Get out. I asked her to get out the car. She got out.

(Tr. Vol. II at 331–32.)

{¶ 32} On cross-examination, appellant stated he had previously been convicted of two counts of burglary. At the time of the events, appellant lived with his parents at a residence on Quigley Road, Columbus, located near Scottwood Road, and the vehicle he was driving was registered in his brother's name. Appellant acknowledged lying to detectives about whether he used drugs in 1995. He also acknowledged engaging in fellatio and sexual intercourse with V.G. on October 5, 1995, as well as engaging in fellatio and sexual intercourse with T.L. on November 13, 1995.

{¶ 33} During closing argument, the state argued that the primary issue in the case was whether appellant utilized force during the encounters with V.G. and T.L. On May 6, 2015, the trial court announced its verdict from the bench, finding appellant guilty of all counts. On May 11, 2015, the state filed supplemental discovery with respect to hospital records of V.G. transmitted by Grant Hospital to the state after the trial had concluded. Appellant's counsel subsequently filed a motion for mistrial and for new trial, and the state filed a memorandum contra. On July 8, 2015, the trial court conducted a hearing on the motion. By entry filed July 31, 2015, the court denied appellant's motion for mistrial and for new trial.

{¶ 34} The trial court conducted a sentencing hearing on August 5, 2015. During the hearing, counsel for appellant requested that the trial court sentence appellant under the current sentencing laws as opposed to the sentencing laws in effect at the time of the offenses. The trial court determined that appellant "should be sentenced as the law was in 1995." (Tr. Vol. IV at 4.) By judgment entry filed August 11, 2015, the trial court sentenced appellant to indeterminate sentences of 11 to 25 years on each count, with Counts 1, 2, and 3 to be served concurrent to each other, Counts 4, 5, and 6 to be served concurrent to each other, and Counts 2, and 5 to be served consecutive to each other.

{¶ 35} On appeal, appellant sets forth the following four assignments of error for this court's review:

Assignment of Error 1. The manifest weight of the evidence does not demonstrate beyond a reasonable doubt that Mr. White kidnapped and raped [V.G.].

Assignment of Error 2. The manifest weight of the evidence does not demonstrate beyond a reasonable doubt that Mr. White kidnapped or raped [T.L.].

Assignment of Error 3. Mr. White was deprived of effective assistance of trial counsel.

Assignment of Error 4. Mr. White's sentence is void because he was sentenced under the wrong statute.

*State v. White*, 85 N.E. 3d 1170, 1172-78 (Ohio App. 10th 2017). On March 7, 2017, the appellate court affirmed the judgment of the trial court. *Id*. On July 26, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. White*, 150 Ohio St.3d 1411 (2017).

On March 6, 2018, Petitioner filed this *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As his sole claim for relief, Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to file a motion to dismiss the Indictment based on excessive pre-indictment delay. It is the position of the Respondent that this claim lacks merit.

**Standard of Review**

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court describes the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasizes that federal courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted) ).

Under the AEDPA, the factual findings of the state appellate court are presumed to be correct.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). "Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding").

The United States Court of Appeals for the Sixth Circuit explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49.  In order for a federal court to find that a state court's application of Supreme Court precedent was unreasonable, "the state court's application must have been 'objectively unreasonable,' not just incorrect or erroneous."  *Wiggins v. Smith*, 539 U.S. 510, 520–21, (2003) (internal citations omitted) (citing *Williams v. Taylor*, 529. U.S. at 409); *see also Harrington v. Richter,* 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ) ).  In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis.  *Holder v. Palmer,* 588 F.3d 328, 341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) ) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ); *see also Nicely v. Mills*, 521 Fed.Appx. 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision).  Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before the state court at the time that it rendered its decision.  *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011).  Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did."  *Id*. at 182. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Id*. at 181.

**Application**

The state appellate court rejected Petitioner's claim as follows:

{¶ 53} In order to establish ineffective assistance of counsel, a defendant must demonstrate "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to show prejudice, the defendant "must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. Further, "[i]n order to prevail on a claim of ineffective assistance of counsel in a case involving a failure to make a motion on behalf of a defendant, the defendant must show '(1) that the motion * * * thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made.'" *State v. Kring*, 10th Dist. No. 07AP-610, 2008-Ohio-3290, 2008 WL 2588572, ¶ 55, quoting *State v. Lawhorn*, 3d Dist. No. 11-04-19, 2005-Ohio-2776, 2005 WL 1323111, ¶ 35.

{¶ 54} In general, the primary safeguard against pre-indictment delay is the applicable statute of limitations. *State v. Carter*, 5th Dist. No. 07-CA-4, 2007-Ohio-5259, 2007 WL 2852157, ¶ 16. Additionally, the Due Process Clause of the Fifth Amendment "provides limited protection against preindictment delay." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 97. The Supreme Court of Ohio has "recognized a comparable due-process protection under Article I, Section 16 of Ohio Constitution." *Id*. A defendant asserting a due-process violation based on pre-indictment delay "must present evidence establishing substantial prejudice to his right to a fair trial." *Id*. at ¶ 98. If a defendant makes a preliminary showing of substantial prejudice, "then the burden shifts to the state to present evidence of a justifiable reason for the delay." *Id*. at ¶ 99. The Supreme Court has observed, however, that "[t]he burden upon a defendant seeking to prove that preindictment delay violated due process is '"nearly insurmountable,"' especially because proof of prejudice is always speculative." *Id*. at ¶ 100, quoting *United States v. Montgomery*, 491 Fed.Appx. 683, 691 (6th Cir. 2012), quoting *United States v. Rogers*, 118 F.3d 466, 477 (6th Cir. 1997), fn.10.

{¶ 55} Appellant contends that a court considering the issue of pre-indictment delay is first required to weigh the prejudice to the accused from the delay against the state's reason for the delay, and is then required to make a decision that provides the "fundamental fairness" required by the Due Process Clause. In arguing that his trial counsel was ineffective in failing to file a motion to dismiss, appellant focuses primarily on the state's reason for delaying the indictment (i.e., that the alleged victims were not willing to cooperate in the investigation), and asserts that the state's reason is worthy of zero weight. Based on his claim that the state's reason for the pre-indictment delay is worthy of zero weight, appellant maintains he is only required to show the "slightest prejudice" in order to tip the balance in favor of dismissal. In support of his argument, appellant relies in part on several cases from the Eighth District Court of Appeals, including *State v. Dixon*, 2015-Ohio-3144, 40

N.E.3d 601, *State v. Mack,* 8th Dist. No. 100965, 2014-Ohio–4817, 2014 WL 5500021, and *State v. Jones*, 2015-Ohio-2853, 35 N.E.3d 606 ("*Jones I*").

{¶ 56} At the time of oral argument in this case, one of the decisions relied on by appellant, *Jones I* (and which was cited with approval by the court in *Mack*), was pending before the Supreme Court. We note that the Supreme Court recently reversed the Eighth District Court of Appeal's majority decision in *Jones I. See State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688 ("*Jones II*").FN1 Because *Jones II* is of significance to issues raised in the instant assignment of error, we begin with a discussion of both *Jones I* and *II*.

FN1: At the time of oral argument, counsel for appellant acknowledged that the decision of the Eighth District Court of Appeals in *Jones I* was pending before the Supreme Court. Counsel for appellant also filed, subsequent to oral argument, supplemental authority noting the Supreme Court's recent decision in *Jones II.*

{¶ 57} Under the facts of *Jones I,* the defendant filed a motion in the trial court to dismiss his indictment, alleging that the state's 20–year delay in bringing the indictment caused him actual prejudice in defending against a charge of rape. The defendant maintained that he and the victim had engaged in consensual sex in 1993, and the defendant claimed he told police at that time of a consensual encounter. Further, the defendant's mother passed away in 2011, and the defendant argued that his mother would have been able to testify that he and the alleged victim were more than just casual acquaintances and she did not hear anything unusual at the home on the date in question. The trial court granted the defendant's motion to dismiss, and the state appealed that determination.

{¶ 58} In *Jones I*, the Eighth District Court of Appeals affirmed the judgment of the trial court in a two-to-one decision in which the majority concluded the defendant suffered actual prejudice. Specifically, the majority decision cited evidence that "the identity of the defendant as the accused perpetrator was known from the beginning, * * * the state barely investigated the case and closed it within one week of the start of its investigation, and * * * no further investigation or technological advances occurred in the time between the initial investigation and the indictment." *Id*. at ¶ 47.

{¶ 59} In reaching that determination, the majority evaluated the defendant's claim of actual prejudice "in terms of basic concepts of due process and fundamental justice." *Id*. Furthermore, the court in *Jones I* "considered the reasons for the preindictment delay prior to determining actual prejudice." (Emphasis added.) *State v. Smith*, 8th Dist. No. 103586, 2016-Ohio-8043, 2016 WL 7158601, ¶ 35, citing *Jones I.*

{¶ 60} In *Jones I,* the dissent disagreed with the majority's "application of a less stringent standard for assessing actual prejudice in preindictment delay claims," asserting that "[t]his new so-called 'due process and fundamental justice' standard

offered by the majority is in conflict with the long-standing actual or substantial prejudice standard that has been in play over the past three decades in Ohio." *Id*. at ¶ 51 (Gallagher, J., dissenting). The dissent further argued that "a defendant must demonstrate actual prejudice free of speculation before a court considers whether there is a justifiable reason for the delay." *Id*. at ¶ 52. According to the dissent, "shifting the burden to the state to demonstrate a justifiable reason for delay without a showing of actual prejudice circumvents an extended statute of limitations period, invariably defeating legislative intent." *Id*. at ¶ 55.

{¶ 61} On further appeal by the state, the Supreme Court in *Jones II* reversed the judgment of the Eighth District Court of Appeals, reiterating the "firmly established * * * burden-shifting framework for analyzing a due-process claim based on preindictment delay." *Id*. at ¶ 13. Under that analysis, "[o]nce a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id*.

{¶ 62} In *Jones II*, the state argued on appeal that the Eighth District's majority opinion constituted a departure from "well-established precedent requiring a defendant to establish actual prejudice—separate from the state's reasons for the delay—before the burden shifts to the state to justify its delay." *Id*. at ¶ 14. The Supreme Court agreed, finding that the majority "blurred the distinctions between the existence of actual prejudice and the lack of a justifiable reason for the delay by focusing almost exclusively on the actions and inactions of the police." *Id*. at ¶ 15. Specifically, the Supreme Court held that the "majority's focus on the actions and inactions of the police * * * demonstrates the majority's abandonment of the two-step, burden-shifting analysis for determining whether preindictment delay constitutes a due-process violation." *Id*. at ¶ 18. Thus, "[b]y considering the reasons for the state's delay before independently determining whether Jones established actual prejudice because of that delay, the Eighth District majority erred." *Id*.

{¶ 63} The Supreme Court then turned to the state's second primary argument, i.e., that the Eighth District majority "ignored precedent by concluding that Jones established actual prejudice." *Id*. at ¶ 19. According to the state, the record contained "only speculation regarding the exculpatory value of the allegedly lost or otherwise unavailable evidence." *Id*.

{¶ 64} In examining the issue of actual prejudice, the Supreme Court noted that "[a] determination of actual prejudice involves '"a delicate judgment"' and a case-by-case consideration of the particular circumstances." *Id*. at ¶ 20, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Further, the court "must 'consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay.'" *Id.* quoting *Walls* at ¶ 52. The court also acknowledged its prior decisions suggesting that "speculative prejudice does not satisfy the defendant's burden." *Id.*

{¶ 65} In *Jones II,* the Supreme Court specifically "reject[ed] the Eighth District majority's application of an amorphous standard based on concepts of fundamental justice to determine the existence of actual prejudice." *Id*. at ¶ 23. The Supreme Court observed that "[e]ach time this court has considered preindictment delay, we have scrutinized the claim of prejudice vis-à -vis the particular evidence that was lost or unavailable as a result of the delay and, in particular, considered the relevance of the lost evidence and its purported effect on the defense." *Id*.

{¶ 66} The Supreme Court cited several of its prior decisions, *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), and *Adams*, as offering guidance in considering the issue of actual prejudice. In *Luck*, the defendant asserted he had suffered prejudice from a 15–year delay in prosecution where two key witnesses had died, including one witness who was purportedly present at the shooting victim's apartment at the time she was killed; further, under the facts of that case, all of the tape-recorded interviews with potential witnesses and suspects compiled by the police department had been destroyed. *See id*. at 154, 472 N.E.2d 1097. The court in *Luck* found the defendant was "'obviously prejudiced by not being able to seek verification of her story from [the witness purportedly with the defendant at the time of the alleged murder] and thereby establish mitigating factors or a defense to the charge against her.'" *Jones II* at ¶ 25, quoting *Luck at* 158, 472 N.E.2d 1097. Accordingly, "the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant, and thereby aid in establishing a defense, may satisfy the due-process requirement of actual prejudice." *Id*. The death of a potential witness, however, "will not always constitute actual prejudice." *Id*. at ¶ 26. In the *Adams* decision, the Supreme Court found no actual prejudice from pre-indictment delay where the defendant "did not explain what evidence the deceased witness 'might have offered,' and * * * the deceased witness had actually implicated Adams in the murder before he died." *Id*. quoting *Adams* at ¶ 103.

{¶ 67} In *Jones II,* the Supreme Court agreed with the Eighth District's "dissent's concerns about a defendant's reliance on mere speculation to support a claim of actual prejudice." *Id*. at ¶ 27. In this respect, "the possibility of faded memories, inaccessible witnesses, and lost evidence is insufficient to demonstrate actual prejudice." *Id*. Rather, "[t]hose are 'the real possibilit[ies] of prejudice inherent in any extended delay,' and statutes of limitations sufficiently protect against them." *Id*. at ¶ 21, quoting *Marion* at 326, 92 S.Ct. 455. Instead, "[a]ctual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id*. at ¶ 28.

{¶ 68} We recognize that the parties in this case did not have the benefit of the decision in *Jones II* at the time of briefing before this court. In light of that decision, however, we find unpersuasive appellant's argument that he need only demonstrate the "slightest prejudice" in order to tip the balance in favor of dismissal based on his assertion that the state's reason for the pre-indictment delay is worthy of zero

weight. As noted, the Eighth District's majority in *Jones I* focused primarily on the inactivity of police, and "considered the reasons for the preindictment delay prior to determining actual prejudice." *Smith* at ¶ 35, citing *Jones I*. In *Jones II,* however, the Supreme Court "determined that actual prejudice is the first step in establishing unjustifiable preindictment delay." *Smith* at ¶ 35, citing *Jones II* at ¶ 13. *See also State v. Rusnak*, 7th Dist. No. 15 JE 0002, 2016-Ohio-7820, 2016 WL 6835551, ¶ 8, citing *Jones II* at ¶ 18 (noting "[t]he state has no duty to present evidence justifying a delay until the defendant establishes actual prejudice").

{¶ 69} In the present case, appellant asserts that the record shows his defense was prejudiced by pre-indictment delay in the following five respects: (1) at the time of trial, V.G. was no longer a crack addict and, therefore, she "almost certainly" presented herself as a more credible and reliable witness in 2015 than she would have in 1995, (2) T.L. "probably" presented herself as a more credible and reliable witness in 2015 than in 1995 in light of her testimony that she had an alcohol problem in 1995, (3) facing accusers of such "dubious character," appellant "almost certainly" would not have waived his constitutional right to a jury trial had he been prosecuted in 1995, (4) the passage of two decades likely influenced how the trier of fact would have viewed appellant's credibility because his account of cruising the city seeking to exchange crack for sex seems less plausible now to "modern ears" than it would have seemed 20 years ago, and (5) the passage of time inevitably affects memories.

{¶ 70} As cited above, actual prejudice exists "when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones II* at ¶ 28. Further, proof of actual prejudice "must be specific, particularized and non-speculative." *State v. Stricker*, 10th Dist. No. 03AP-746, 2004-Ohio-3557, 2004 WL 1488730, ¶ 36.

{¶ 71} Here, appellant does not point to any particular missing evidence or unavailable witnesses. To the extent appellant argues there is a possibility that V.G. or T.L. would have presented themselves as more credible witnesses in 2015 than in 1995, or that he almost certainly would not have waived his right to a jury trial in 1995, such claims are speculative and do not meet the actual or substantial prejudice requirement. Similarly, whether the passage of time would have influenced "modern ears" to find appellant's account less plausible is also speculative.

{¶ 72} Appellant also contends the passage of time inevitably affects memories, and that both V.G. and T.L. did not remember certain details during their testimony, including V.G.'s testimony that she did not recall what year she stopped using crack, and T.L.'s statement that she did not remember whether she was going to work on the date of the incident. However, "the possibility of faded memories, unavailable witnesses, and lost or destroyed evidence does not, in and of itself, constitute actual prejudice." *State v. Smith*, 8th Dist. No. 104203, 2016-Ohio-7893, 2016 WL

6906391, ¶ 19, citing *Jones II* at ¶ 21. On review of the record presented, including the testimony of V.G. and T.L., we do not find that appellant demonstrated substantial prejudice from the fact these witnesses may not have recalled certain details. *See, e.g., State v. Battiste*, 8th Dist. No. 102299, 2015-Ohio-3586, 2015 WL 5155686, ¶ 51 (nothing in the record to suggest appellant was prejudiced by witnesses inability to recall certain details; defense counsel, in fact, utilized the inability of one witness to recall certain details to appellant's advantage); *Smith*, 2016-Ohio-7893, 2016 WL 6906391 at ¶ 20 (rejecting appellant's claim that memories of the offense were severely compromised by nearly 20–year delay; record belied appellant's assertion as victim's account of rape on reopening of case was consistent account as reported at time of incident); *State v. Clark*, 12th Dist. No. CA2007-03-037, 2008-Ohio-5208, 2008 WL 4456996, ¶ 49 ("although appellant argues that he was prejudiced by defense witnesses' faded memories, he has not shown how the witnesses' recollection of the altercation would have changed the outcome of the trial").

{¶ 73} On review of the record of proceedings and relevant case law, including Jones II, we find that appellant has not established a reasonable probability of success had trial counsel filed a motion to dismiss on the basis of pre-indictment delay. As such, appellant was not prejudiced as a result of his trial counsel's alleged ineffectiveness. Further, because appellant has failed to establish the prejudice prong of *Strickland,* we need not consider the state's reasons for the pre-indictment delay. *Adams* at ¶ 107.

*State v. White*, 85 N.E. 3d at 1181-86.

**Ineffective Assistance of Counsel**

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below and objective standard of

reasonableness." *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Poole*, 547 F. App'x at 754 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).", 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland's* high bar is never . . . easy.' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult. . . ." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ) (and citing *Strickland,* 466 U.S. at 689).

The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

**Preindictment Delay**

In *United States v. Marion*, 404 U.S. 307, 322 (1971), the United States Supreme Court held that applicable statutes of limitations provide "predictable legislatively enacted limits on prosecutorial delay" and provide "the primary guarantee against bringing overly stale criminal charges." *Id*. at 320. The Speedy Trial Clause of the Sixth Amendment is not triggered until a formal indictment or information is filed or "the actual restraints imposed by arrest and holding to answer a criminal charge" have occurred. *United States v. Lovasco,* 431 U.S. 783, 788–89 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)); *see also Doggett v. United States*, 505 U.S. 647, 655 (1992). The Due Process Clause of the Fifth Amendment requires dismissal of the charges based on pre-indictment delay only where it is shown that the delay caused "substantial prejudice" to the Petitioner's right to a fair trial and the delay was "an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. at 322. Thus, to obtain dismissal of the charges based on pre-indictment delay, the defendant must show that he was substantially prejudiced by the delay and that the delay was "an intentional device by the government to obtain a tactical advantage." *Parker v. Burt*, 595 F. App'x 595, 601 (6th Cir. 2015) (quoting *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992)). The Supreme Court has explained:

> [I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S., at 324, 92 S.Ct., at 465, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

18

*Lovasco*, at 795–796 (footnotes and citations omitted). "Thus, particularly where the delay is investigative rather than intended to gain a tactical advantage over the accused, preindictment delay does not offend the Fifth Amendment." *United States v. Brown*, 959 F.2d 63, 65 (6th Cir. 1992) (citing *Lovasco*, at 795). "A defendant bears a 'heavy burden' on a claim that a pre-arrest delay violated due process." *Mayes v. Hoffner*, No. 2:13-cv-12742, 2016 WL 3385084, at *3 (E.D. Mich. June 20, 2016) (citing *United States v. Baltimore*, No. 10-3305, 2012 WL 2379890, *3 (6th Cir. June 6, 2012) (citing *United States v. Rogers*, 118 F.3d 466, 477 n. 10 (6th Cir. 1997) (noting that "[t]he standard for pre-indictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative")).

### Application

Petitioner argues that the preindictment delay violated *Barker v. Wingo*, 407 U.S. 514 (1972), and that the state appellate court improperly required him to establish prejudice. *Petition* (ECF No. 2, PAGEID # 22-23.) However, *Barker* does not apply to cases of preindictment delay, but to cases involving post-indictment delay. *See Parker v. Bu*rt, 595 F. App'x at 602 ("Courts employ a balancing test to determine whether post-indictment delay violates the Sixth Amendment" and consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.") (citing *Barker*, 407 U.S. at 530)). Thus, the balancing test set forth in *Barker* does not apply here. Further, Petitioner does not allege, and the record does not reflect, that the delay in bringing charges against him was the result of any intentional device by the prosecution to obtain a tactical advantage. Instead, any delay was the result of the victims' reluctance to prosecute, and the subsequent development of DNA evidence. Therefore, Petitioner cannot establish a due process violation.

The due process rights of a defendant are not violated absent a showing of bad faith on the part of the prosecution or "proof of intentional government delay to gain a tactical advantage over the defendant." *United States v. Norris*, 501 F.Supp.2d 1092, 1099 (S.D. Ohio 2007) (citing *United States v. Talbot,* 825 F.2d 991, 1000 (6th Cir. 1987); *United States v. Lawson*, 780 F.2d 535, 541 (6th Cir. 1985); *United States v. Gouveia*, 467 U.S. 180, 192 (1984)); *see also Parker v. Burt*, 595 F. App'x 595, 601 n.4 (6th Cir. 2015) (for additional citations). Further, the state appellate court has determined that excessive preindictment delay likewise did not violate Ohio law. This Court defers to that determination. *See Dukles v. Chuvalas*, No. 1:15-cv-2164, 2017 WL 3447830, at *7 (N.D. Ohio July 5, 2017) (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). Therefore, Petitioner has failed to establish the denial of the effective assistance of counsel under *Strickland* based on his attorney's failure to file a motion to dismiss the Indictment for excessive preindictment delay.

**Recommended Disposition**

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in

part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

<u>   s/ *Elizabeth A. Preston Deavers*</u>
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge